**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**NEW HOPE FAMILY SERVICES, INC.**,

                Plaintiff,

     vs.

**LETITIA JAMES**, in her official capacity
as New York State Attorney General;
**LICHA NYIENDO**, in her official capacity
as Commissioner of the New York Division
of Human Rights; **MELISSA FRANCO**,
in her official capacity as Deputy
Commissioner for Enforcement of the New
York Division of Human Rights; **GINA
MARTINEZ**, in her official capacity as
Deputy Commissioner for Regional Affairs
of the New York Division of Human
Rights; **JULIA DAY**, in her official
capacity as Syracuse Regional Director of
the New York Division of Human Rights;
**WILLIAM FITZPATRICK**, in his official
capacity as Onondaga County District
Attorney,

                Defendants.

---

**Case No.** _5:21-cv-01031_ (MAD/TWD)

**VERIFIED COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

## CONTENTS

INTRODUCTION..................................................................................................................1

JURISDICTION AND VENUE ............................................................................................2

PARTIES ...............................................................................................................................3

FACTUAL BACKGROUND.................................................................................................5

New Hope's historic ministry and New York's adoption crisis.................................5

New Hope's religious character, beliefs, and policy................................................8

New Hope is an expressive association comprising its board members, staff, volunteers and candidate adoptive parents. ..............................................................................9

New Hope's value-laden communications with adoptive couples.........................12

New Hope's value-laden communications with birthparents.................................14

New Hope's value-laden communications directed toward the government. .......16

New York law permits and even requires adoption agencies to consider generally "protected criteria" when making placement decisions.........................................19

New Hope obtains judicial protection of its constitutional rights of Free Speech and Free Exercise. ......................................................................................................22

The New York Division of Human Rights launches a discriminatory and harassing investigation based on a bad-faith complaint. ......................................................24

An investigation by any or all of the Defendants will inflict irreparable injury on New Hope. ......................................................................................................................28

Count I: Denial of Free Speech Rights Protected by the First and Fourteenth Amendment .......................................................................................................................32

Count II: Denial of Free Exercise of Religion Protected by the First and Fourteenth Amendment .......................................................................................................................34

PRAYER FOR RELIEF.......................................................................................................37

## INTRODUCTION

This is a federal civil rights action brought pursuant to 42 U.S.C. §1983 challenging, as a violation of rights protected by the First and Fourteenth Amendments to the United States Constitution, the active threat by the New York Division of Human Rights ("NYDHR") to investigate and penalize New Hope Family Services, Inc., a Christian ministry, for its faith-based choice to devote its private energies and resources to placing infants with couples consisting of a mother and father committed to each other in marriage.

New Hope was founded more than 50 years ago as a Christian ministry. Its faith teaches New Hope that family as God created it is built around a man and woman committed to each other in marriage for life, and therefore that the best interests of each child committed to New Hope's care is served by placing that child into a loving home that includes a married mother and father. Over the years, New Hope has placed more than 1,000 New York children into permanent, loving homes. New Hope is privately funded, accepting no money from the government.

In currently ongoing litigation between New Hope and an agency of the State of New York, two federal courts have already found that efforts by the State to force New Hope to change this choice, in violation of its religious beliefs, likely violate both New Hope's Free Speech rights and its Free Exercise rights, and the district court has already entered a preliminary injunction protecting New Hope's

1

right and ability to continue to operate and speak in a manner consistent with its beliefs. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020); *New Hope Fam. Servs., Inc. v. Poole*, 493 F. Supp. 3d 44 (N.D.N.Y. 2020). And on similar facts, the Supreme Court of the United States has even more recently held that an effort by the City of Philadelphia to invoke non-discrimination laws to require a faith-based foster-care agency to operate in violation of its religious beliefs violated the Free Exercise rights of that religious organization. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

Despite this pending litigation, the in-force preliminary injunction, and the very clear teachings of all these courts, the State of New York, acting through the NYDHR, is threatening to investigate and penalize New Hope under the New York Human Rights Law, N.Y. Exec. Law §296 ("the Human Rights Law"), for exactly the conduct and speech which courts have already held are protected by the First Amendment. New Hope brings this action to put a stop to this illegal and indefensible harassment.

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States. This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343.

2.      This Court has authority to grant the requested injunctive relief under 28 U.S.C. §1343; the requested declaratory relief under 28 U.S.C. §§2201 and 2202; the requested compensatory and nominal damages under 28 U.S.C. §1983; and costs and attorneys' fees under 42 U.S.C. §1988.

2

3. Venue lies in the Federal District Court for the Northern District of New York pursuant to 28 U.S.C. §1391(b). A substantial part of the actions or omissions giving rise to this case occurred within this District, and at least one of the defendants resides within this District.

## PARTIES

4. Plaintiff New Hope Family Services, Inc. is a religious non-profit corporation duly incorporated under the laws of New York, with its principal place of business at 3519 James Street, Syracuse, NY 13206.

5. Defendant Letitia James is the New York State Attorney General and is sued in her official capacity. Defendant James is the head of the Department of Law, which includes the Civil Rights Bureau, *see* N.Y. Exec. Law §60, and has the duty to enforce the laws of New York throughout the state of New York, including N.Y. Exec. Law §296. N.Y. Exec. Law §63. Defendant James accepts, files, and receives notice of complaints alleging violations of New York's laws, and administers, enforces, and prosecutes New York's laws, including the laws' criminal provisions. *See, e.g.,* N.Y. Exec. Law §§63(9), (10), (12), 297(1), 299; N.Y. Civ. Rights Law §40-d; N.Y. Exec. Law, App. §465.3(a)(2). Defendant James may also intervene in any hearing before the NYDHR involving a complaint filed under the human rights law. N.Y. Exec. Law §297.4(4)(a); N.Y. Exec. Law, App. §465.12(c)(1). The New York Attorney General's office, and Attorney General James in particular, has exercised her authority under N.Y. Exec. Law §63(12) to prosecute businesses for violating anti-discrimination laws.

6.     Defendant Licha Nyiendo is the Commissioner of the New York Division of Human Rights and is sued in her official capacity. Defendant Nyiendo is authorized and responsible to enforce New York's civil rights laws, including N.Y. Exec. Law §296.

7.     Defendant Melissa Franco is the Deputy Commissioner for Enforcement of the New York Division of Human Rights and is sued in her official capacity. Deputy Commissioner Franco is authorized and responsible to enforce New York's civil rights laws, including N.Y. Exec. Law §296.

8.     Defendant Gina Martinez is the Deputy Commissioner for Regional Affairs of the New York Division of Human Rights and is sued in her official capacity. Defendant Martinez oversees operations at each of NYDHR's regional offices, including the Syracuse regional office where a complaint against New Hope is pending. Defendant Martinez is authorized and responsible to enforce New York's civil rights laws, including N.Y. Exec. Law §296.

9.     Defendant Julia Day is the Regional Director of the New York Division of Human Rights' regional office in Syracuse, New York, and is sued in her official capacity. Defendant Day oversees the regional office where a complaint was filed against New Hope. In disregard of law and relevant judicial decisions, Defendant Day sent New Hope a letter demanding that it respond to that complaint. Defendant Day is authorized and responsible to enforce New York's civil rights laws, including N.Y. Exec. Law §296.

4

10. Defendant William Fitzpatrick is the District Attorney for Onondaga County, New York, where New Hope operates and where a complaint against New Hope was filed with the NYDHR. Defendant Fitzpatrick has authority to criminally prosecute individuals or employers who violate an order of the Division of the Commissioner. N.Y. Exec. Law art. 15 §299; N.Y. Cnty. Law §700. Defendant Fitzpatrick is sued in his official capacity.

11. At all times relevant to this Complaint, each and all of the acts alleged here are attributable to Defendants, who acted under color of a statute, regulation, custom, or usage of the State of New York.[1]

## FACTUAL BACKGROUND

### New Hope's historic ministry and New York's adoption crisis.

12. At the very beginning of the Christian faith, the Apostle James commanded believers to care for the "widow and orphan." *James* 1:27. In colonial America and the early years of the Republic, it was Christian organizations, both Catholic and Protestant, that first undertook systematic efforts to provide homes for orphan children, long before government took any steps to meet this need. One of the very first orphanages in America was founded in pre-revolutionary times by the famous preacher George Whitfield. Shortly after the revolution, the first orphanage in New York was financed by churches throughout the city and promoted by Mrs.

---

[1] Unless context indicates otherwise, the remainder of the complaint refers to all defendants collectively as "New York," and to all defendants with the exception of Attorney General James and District Attorney William Fitzpatrick as "NYDHR."

Alexander Hamilton. In 1798, a Catholic priest in Philadelphia organized an association to care for orphans whose parents had died in a yellow fever epidemic.

13. In 1958, a Christian pastor named Clinton Tasker began the work of organizing New Hope Family Services (under a predecessor name of Evangelical Family Services, Inc.) for the express purpose of continuing this long tradition of Christian service and obeying the commandment of the Apostle James by working to place orphaned or abandoned children into adoptive homes.

14. In 1965, New Hope's incorporation was approved by the State Board of Social Welfare under its predecessor name, Evangelical Family Services, Inc. New Hope's founding board, like its board today, was composed of Christian clergy and other believers who viewed this as a command and calling of their faith. New Hope operates as a New York voluntary adoption provider and is authorized to place children with New York State residents. Through its adoption program, New Hope serves individuals across much of New York State.

15. New Hope's mission is to be Christ's hands extended to offer hope and help to people with pregnancy, parenting, adoption, or post-abortion needs in the Syracuse area and throughout the State of New York.

16. Since its founding, New Hope has worked with birthmothers and adoptive parents to place more than 1000 New York children into permanent homes. New Hope devotes its efforts exclusively to placing infants and very young children for adoption. Within the last 20 years, New Hope has not placed any child older than three years of age.

6

17.    New Hope has an extraordinary record of being willing to place, and successfully finding adoptive parents willing to accept, children who are categorized as "hard to place" due to disability, medical condition, race, or other factors. New Hope has placed Down Syndrome infants, as well as multiple children born with Neonatal Abstinence Syndrome—that is children who were exposed to drugs *in utero* and who often require time in the Neonatal Intensive Care Unit and may suffer lifelong consequences. In recent decades, the substantial majority of infants placed by New Hope have fallen into one or more "hard to place" categories. Yet New Hope has never failed to find a permanent adoptive home for any child entrusted to its care—even infants with severe medical conditions.

18.    In order to scrupulously ensure its autonomy to operate in accordance with its religious beliefs, New Hope accepts no government funding. Its operations are entirely funded by private contributions and by fees paid by couples with which New Hope works to perform home studies and complete adoptions.

19.    The need for adoptive homes in the nation and in New York remains tragically large today. There are over 400,000 children in foster care in the United States. Over 120,000 of those children are waiting to be adopted. In 2020, more than 15,000 children were in foster care in the State of New York. Of these, more than 3,000 were waiting to be adopted. Yet, in 2020, throughout the state of New York, a total of only 660 children were adopted.

7

**New Hope's religious character, beliefs, and policy.**

20.     "New Hope Family Services, Inc. . . . is a voluntary, privately funded Christian ministry." *New Hope*, 966 F.3d at 148. New Hope's Christian faith and religious beliefs motivate and permeate its mission and all of its activities.

21.     New Hope requires all board members, staff, and volunteers to agree with and sign New Hope's statement of faith, to support its religious mission, and to conduct themselves consistently with Christian faith and teachings. All of New Hope's paid staff and counseling volunteers are expected to counsel consistently with biblical teachings, and to be ready and willing to pray with any client who requests prayer or with other staff. Indeed, New Hope's board members, staff, and volunteers devote their time to New Hope because they believe in and want to join their efforts to further New Hope's mission and messages.

22.     As part of what New Hope understands to be teachings of its faith, New Hope believes that marriage as God created it consists of the union of one man and one woman, for life; that a family built around this type of marriage is the family structure designed by God and is the ideal and healthiest family structure for mankind and specifically for the upbringing of children; and that placement with a family that includes a mother and father committed to each other for life in marriage is therefore in the bests interest of each child that is entrusted to New Hope for placement. The Supreme Court has recognized that this belief about the nature of marriage and family is one held by many, and "based on decent and honorable religious or philosophical premises." *Obergefell v. Hodges*, 135 S. Ct.

8

2584, 2602 (2015). The "best interests of the child" has long been and remains the primary goal of New York's adoption laws. As a result of this priority and its beliefs, New Hope does not place children with unmarried couples or same-sex couples.

23.    At the same time, New Hope does not "reject" unmarried or same-sex applicants (a formal rejection would complicate those applicants' ability to later obtain approval through any agency). Instead, New Hope politely and respectfully informs them that because of its beliefs as a Christian ministry, New Hope cannot be the agency to serve them. New Hope is willing to provide referrals to other agencies that will. In providing this information, New Hope is simply informing inquirers that New Hope is conducting its ministry in precisely the way that the Unites States District Court has preliminarily and publicly held that New Hope has a right to do–a right protected by the First Amendment of the Constitution.

24.    According to the website of the New York Office of Child and Family Services, "In New York State, there are more than 130 adoption agencies. Each of New York's 58 social services districts has an adoption unit, and more than 70 authorized voluntary agencies statewide work with adopting families." *Adoption Services*, Office of Children and Family Services, https://ocfs.ny.gov/programs/adoption/process.php#choose (last visited Sept. 16, 2021). The vast majority of New York's adoption agencies will place with unmarried and same-sex couples.

**New Hope is an expressive association comprising its board members, staff, volunteers and candidate adoptive parents.**

25.    New Hope's mission and ministry is not confined to placing children for adoption. New Hope is also committed to conveying to those it serves what its board

9

members, staff, and volunteers believe to be the biblical system of values about the value of human life (including human life before birth), marriage, and family.

26. For each New Hope employee, working with New Hope is primarily a calling and a ministry, and only secondarily a job. New Hope team members believe that Christian truths about the Gospel and healthy families will profoundly help infants, birthparents, and adoptive parents. All New Hope team members have associated together in part because they can convey those shared beliefs and values more effectively through their adoption work at New Hope. Many New Hope employees could receive higher pay working somewhere else but choose to work with New Hope because they view their work with and through New Hope primarily as a ministry motivated by their faith, not primarily as a means of earning income.

27. New Hope's employees meet regularly to pray for the work of New Hope, and to pray for all the people whom New Hope serves, including infants, birthparents, adoptive couples, and the many additional mothers and infants who are served by New Hope's crisis pregnancy ministry.

28. If New Hope began placing children with unmarried or same-sex couples, the messages that New Hope desires to convey would be blocked and indeed contradicted, and many New Hope team members would no longer associate with New Hope, because by participating in such placements New Hope would be endorsing and expressing a message that they believe to be wrong and inconsistent with their faith.

10

29.     Further, New Hope does not provide adoption services to the general public. Rather, it does so only for a modest number of couples each year—a group that results from selection by both New Hope and the couples themselves. On New Hope's side, that selection occurs during a lengthy screening process that includes background checks, medical exams, and an intensive and deeply personal home study process.

30.     On the side of the adoptive parents, the majority of those served by New Hope choose to work with New Hope (rather than one of the many available secular agencies) because they value and want to work with an adoption agency that shares their faith, or because they value the faith-based perspective and values that New Hope brings to its work, regardless of their own religious faith. In either case, these couples want to work through the difficult emotional issues surrounding adoption in an environment in which they can freely discuss shared faith, values and priorities. Their association with New Hope, and with other adoptive couples in group discussions, provides that environment.

31.     Unmarried or same-sex couples who seek to adopt necessarily hold strongly different beliefs about marriage, family and the best interests of children than does New Hope. If New Hope were compelled to include applicants with such beliefs in the groups of candidate adoptive parents it works with, this would severely disrupt these open discussions among like-minded people who share similar values about marriage and family.

**New Hope's value-laden communications with adoptive couples.**

32.     New Hope is an openly religious ministry, and its staff and volunteers communicate extensively about their faith-based set of values in their work with adoptive couples and applicants. Group meetings with applicants open in prayer, and include prayer for the applicants themselves, for birthmothers, for children in need of homes, and for the new families to be formed through adoption.

33.     These communications with applicant parents also include quoting scripture passages concerning children and families, discussion of marital issues and parenting philosophy, and counseling about how to build a healthy family environment for an adoptive child.

34.     If New Hope were required to work with unmarried or same-sex couples in the counseling and home study process, New Hope would be compelled by conscience–guided by its faith–to advise those couples that New Hope does not believe that an unmarried or same-sex couple can provide the best home for adopted children, because the best home for each infant is a family comprised of a mother and father committed to each other–and thus together to their children–for life in marriage.

35.     New Hope also wishes to accurately describe to potential applicants its beliefs and thus the nature of the families it can serve, so as to avoid misunderstanding and wasting the time of any potential applicant.

36.     New Hope's mission also includes evangelism–that is, telling others about the Christian faith. The home study process is structured around four major

12

meetings, at which New Hope discusses its faith. New Hope happily works with adoptive couples who are not Christians and does not pressure any applicants to listen to any evangelistic message, but New Hope does want all those it serves to be aware of and have an opportunity to learn about the faith that inspires New Hope's service. However, New Hope staff only engage in such conversations with those who wish to have them.

37.    New Hope's communications with applicant adoptive parents include group discussions involving multiple couples, specific private and in-depth discussions that are formal parts of the home study and approval process, and additional private counseling conversations with individual couples. New Hope also provides counsel and advice to adoptive couples about how to prepare and present themselves in a "profile" which will be shown to birthmothers as they choose an adoptive family for their child.

38.    New Hope staff could not–meaningfully and in good faith to both the adoptive couple and birthparents–advise unmarried and same-sex couples about preparing a profile while remaining true to New Hope's beliefs about family and the best interests of children.

39.    Shortly after adoptive parents have submitted their profile, the New Hope caseworker discusses again in more detail the characteristics and legal risks of a child they are willing to adopt. Consistent with state law and regulation, this discussion will include whatever preferences that couple may have for a child of a specific sex, race, color, or ethnicity.

40.    New Hope cannot, consistent with its convictions, state by word or action to adoptive parents that it believes that adoption by an unmarried or same-sex couple will be consistent with the best interests of a child.

**New Hope's value-laden communications with birthparents.**

41.    New Hope also engages in value-laden discussion with birthmothers (and birthfathers where possible). New Hope provides to birthparents counseling concerning adoption, the adoption process, and the selection of adoptive parents.

42.    During the counseling process, New Hope discusses with birthparents what they want in the adoptive family with whom they place their baby. Consistent with state law and regulations, this includes discussing the birthparents' religious beliefs and whether they desire their baby to be placed in a home that practices those beliefs. Consistent with state law and regulations, New Hope also discusses birthparents' race, ethnicity, and/or color and whether they desire the child to be placed with adoptive parents of similar race, ethnicity, or color.

43.    During this process, birthmothers or birthfathers may also make statements to New Hope's birthparent caseworker about the age or sex of individuals with whom they would be willing to place their child. During this process, birthmothers or birthfathers may also make statements about the family structure they would desire for their child's placement, such as a preference or aversion for the child to be placed in a home that already has other biological or adopted children, or a preference for the child to be placed in a home with a married mother and father.

14

44. Based on the birthparents' desired characteristics for an adoptive family, New Hope reviews its list of prospective adoptive parents.

45. Once a birthmother is approximately seven months along in her pregnancy (or as soon as possible if the child has already been born), a New Hope case worker meets with the birthmother (or both birthparents if possible) to show her actual parent profiles created by its current list of approved prospective adoptive parents.

46. New Hope typically shows between two and five parent profiles to its prospective birthparents and ensures that the profiles match the birthparents' desires as well as the adoptive parents' willingness to adopt a child with the anticipated characteristics of the specific child.

47. When New Hope presents the profile of any adoptive couple to a birthmother, New Hope is representing that it believes that placement with that family is consistent with the best interests of that child.

48. New Hope cannot, consistent with its convictions, state by word or action to birthparents that it believes that adoption by an unmarried or same-sex couple will be consistent with the best interests of their child.

49. Indeed, if New Hope were forced to work with unmarried or same-sex couples to approve them as adoptive parents, in light of its faith-based beliefs about family and the best interests of children, New Hope would be compelled by conscience informed by its faith to advise each birthmother whom it serves that it

15

does not believe that an unmarried or same-sex couple could provide the best home for her child.

50. Most of the adoptions New Hope handles are considered open adoptions, meaning that New Hope continues to facilitate some degree of ongoing communication between the adoptive parents and birthparents about the child even after the adoption is finalized, often until the child reaches 18 years of age.

### New Hope's value-laden communications directed toward the government.

51. New Hope also engages in value-filled speech directed toward the government.

52. As part of New Hope's evaluation of a prospective adoptive couple, New York State requires New Hope to complete a "home study" of that couple, and an extensive report recording New Hope's evaluation of that couple. New Hope is required to evaluate a host of factors about the applicant family, including the adoptive parents' marriage relationship, mental and emotional stability, community and family ties, existing family relationships, and their attitudes and expectations regarding their own children and parent/child relationships.

53. After it conducts an extensive home study with a candidate couple, New Hope is obliged to either approve or disapprove that couple to receive an adoption placement, based on New Hope's judgment as to the best interests of the child who may be placed in the home. New York requires New Hope to complete a "Final Assessment and Determination" form that records New Hope's conclusions, including New Hope's "determination on whether to approve or not approve the

16

application." In this same form, New Hope must certify whether the "current marital status of the applicant(s) affects the ability of the parent(s) to provide adequate care." New Hope must answer "Yes" or "No" and then give its "explanation" for that answer. In Section IV of that form, New Hope must analyze the prospective adoptive parents' relationship to one another. In so doing, New Hope must give its view on the couple's "strengths," the "supports" they need, and the "considerations" New Hope applied in performing this relationship analysis.

54.    Both the New Hope case worker and his or her supervisor are required by New York regulations to sign this Final Assessment and Determination after it is completed, affirming their agreement with what it states. By completing and signing this document, including a positive affirmation that this couple can be approved for adoption, New Hope is certifying its judgment and opinion that adoption by this couple can be in the best interests of children who are awaiting adoption.

55.    After an initial placement and a supervision period, New Hope must make a final, official recommendation that the placement be finalized, representing its conclusion that this particular placement is indeed in the best interests of this particular child. Specifically, before finalization, the home study and supervisory reports prepared by New Hope must be notarized. These reports serve as New Hope's official recommendation of the adoptive family for the adoption of the specific child.

17

56.    Finally, in order for an adoption supervised by New Hope to receive necessary court approval, New Hope must execute an "Adoption and Consent" document, again signifying its approval that this adoption is in the best interest of the child. This document is filed with the court.

57.    The conclusion that adoption by a specific couple is in the best interests of the child is by no means merely clerical. The relevant statutes and regulations do not define "the best interests of the child," but rather require the agency to exercise judgment and discretion in considering a wide and non-exhaustive range of factors. Of course, one's judgment about the child's "best interests" will necessarily be–and New Hope's is–guided by one's beliefs about human nature, healthy relationships, and the nature of a healthy family.

58.    Based on its religious beliefs, New Hope strongly believes that the marital status of adoptive parents is indeed an important consideration bearing on the best interests of children who might be entrusted to their care. Specifically, New Hope believes that it would not be in the best interests of any child it places to be placed into a family that is not built around a mother and father committed to each other in marriage. As a result, New Hope would both be violating its beliefs and affirming what it believes to be false and does not want to affirm, if it were to certify its approval of an adoption by an unmarried or same-sex couple.

18

**New York law permits and even requires adoption agencies to consider generally "protected criteria" when making placement decisions.**

59.    Until 2010, New York statute law prohibited adoption by any couple other than a heterosexual, married couple. NY Dom. Rel. Law §110 (2019).

60.    In September 2010, New York amended its law to allow authorized agencies to place children for adoption with "an adult unmarried person, an adult married couple together, or any two unmarried adult intimate partners together." NY Dom. Rel. Law §110 (2019).

61.    The Sponsor of the bill that amended the law used permissive language throughout the Introducer's Memorandum in Support. In the purpose, summary, and justification sections of that Memorandum, the words "permit," "may adopt" and "allow" were used to explain the need for the law. New York Bill Jacket, 2010 S.B. 1523, Ch. 509.

62.    This amended law on its face speaks only to who is legally eligible to adopt. It does not impose any obligation on any adoption agency to serve any couple or individual.

63.    In signing the bill into law, the New York Governor emphasized the permissive nature of the law: "since the statute is permissive, it would allow for such adoptions without compelling any agency to alter its present policies." Approval Memorandum No. 25, Chapter 509. The Governor further stated that the law "expands the rights of New Yorkers, without in any way treading on the views of any citizen or organization." *Id.*

19

64.     New York has never enacted any law requiring any adoption provider to facilitate or participate in any adoption by unmarried or same-sex couples, or indeed to participate in any adoption that the agency believes is not in the best interests of the child. Instead, New York law leaves all such matters to the judgment and beliefs of individual adoption providers.

65.     In fact, New York law creates a large number of exceptions to the non-discrimination requirement of 18 NYCRR §421.3(d), the regulation specific to adoption that is the subject of the ongoing litigation between New Hope and the New York Office of Child and Family Services ("the Regulation"). Indeed, New York law expressly authorizes and even *requires* adoption agencies to consider multiple criteria which the Regulation purports to prohibit them from considering.

66.     By its terms, the Regulation requires that "Authorized agencies providing adoption services shall prohibit discrimination . . . against applicants for adoption services on the basis of race, creed, color, national origin, age, sex, sexual orientation, gender identity or expression, marital status, religion, or disability."

67.     However, when the State has custody of a child, New York Soc. Serv. Law §373 requires the State to "discriminate" based on religion in selecting an adoption agency to transfer custody to, requiring that children be placed "when practicable" with "an authorized agency under the control of persons *of the same religious faith as that of the child.*" (emphasis added)

68.     Agencies, in turn, must also "discriminate" based on religion, as New York law requires that they, "when practicable," place children with persons "of the

20

same religious faith as that of the child." N.Y. Soc. Serv. Law §373(2); N.Y. Comp. Codes R. & Regs. tit. 18 §441.11.

69.    Similarly, adoption agencies are directed to target their efforts to recruit adoptive parents based on race and religion, and specifically toward "communities of populations which have ethnic, racial, religious, or cultural characteristics similar to those of . . . the largest number of waiting children." 18 NYCRR §421.10(a).

70.    New York law permits adoption agencies to reject applicants for multiple other reasons facially prohibited by the terms of the Regulation. An agency may, for example, decline applicants for "poor health" (i.e., "disability") or "limited life expectancy" (i.e., "age"). N.Y. Dom. Rel. Law §110.

71.    Further, the law permits birthparents to request or select adoptive parents based on *whatever* they think is in the best interest of their child when selecting adoptive parents, including "discriminating" based on criteria purportedly prohibited by the Regulation, and requires adoption agencies to "give effect" to the "religious wishes" of birthparents. N.Y. Soc. Serv. Law §373(7); *see also Spence-Chapin Adoption Serv. v. Polk*, 274 N.E.2d 431, 436 (N.Y. 1971) ("[T]hat the mother should have the say on issues of race and religion seems reasonable and is accepted doctrine, so long as she has not abandoned the child or is unfit.").

72.    New York law also permits adoptive parents to "discriminate" in accepting a child based on, e.g., sex. *See* N.Y. Comp. Codes R. & Regs. tit. 18, §421.16.

21

73.     In sum, in multiple important respects New York law permits the government, adoption agencies, birthparents, and adoptive parents to "discriminate" based on religion or other suspect criteria such as race, sex, disability, and age.

74.     Looking beyond the laws and regulations that speak specifically to the adoption process, the New York Human Rights Law itself grants the Division of Human Rights the power to "grant[ ] exemption[s]" to its provisions "based on bona fide considerations of public policy." N.Y. Exec. Law §296.2(b).

**New Hope obtains judicial protection of its constitutional rights of Free Speech and Free Exercise.**

75.     Beginning in 2018, the New York Office of Child and Family Services ("OCFS") demanded that New Hope begin devoting its private energies and resources to working with unmarried and same-sex couples, in violation of New Hope's religious beliefs, or else lose its authorization to act as an adoption agency.

76.     On December 6, 2018, New Hope filed suit in federal court contending that the demand of OCFS that New Hope place infants with unmarried and same-sex couples, and provide home study services to such couples, violated New Hope's rights of Free Speech and Free Exercise protected by the First Amendment.

77.     On July 21, 2020, the Second Circuit reversed a district court's denial of preliminary injunctive relief, holding that New Hope's work as an adoption ministry is "laden" with substantive, discretionary, and value-filled speech in its interactions with applicant parents, with birthparents, and with the State; that New Hope actively seeks to convey "a system of values about life, marriage, family

22

and sexuality to both birthparents and adoptive parents," and that compelling New Hope to work with unmarried or same-sex couples, and to place children with such couples, would likely compel New Hope to communicate messages it believes to be false, censor and prevent New Hope from communicating messages that it desires to communicate, disrupt New Hope's ability to operate as an expressive association to communicate shared beliefs, and violate New Hope's right to operate in compliance with its religious beliefs. *New Hope*, 966 F.3d at 145, 156.

78. On October 5, 2020, guided by the Second Circuit's decision, the District Court for the Northern District of New York held that New Hope had demonstrated a likelihood of success in prevailing both on its Free Speech and its Free Exercise claims, and preliminarily enjoined OCFS from requiring New Hope to work with unmarried or same-sex couples, or penalizing it for declining to do so by revoking its authorization to act as an adoption agency. *New Hope*, 493 F. Supp. 3d at 44. That injunctive protection remains in force.

79. In light of the prior decisions in *New Hope*, 966 F.3d at 145, and *New Hope*, 493 F. Supp. 3d at 44, together with the more recent holding of the Supreme Court in *Fulton*, 141 S. Ct. at 1868, New Hope's constitutional right to conduct the activities of its faith-based adoption service in a manner consistent with the teachings of its faith–and to publicly state those beliefs and practices–is now "clearly established" for purposes of determining the availability of qualified immunity for officials who violate those rights.

23

**The New York Division of Human Rights launches a discriminatory and harassing investigation based on a bad-faith complaint.**

80.     The rulings by the Second Circuit Court of Appeals and the Northern District of New York protecting New Hope's right to continue its ministry in a manner consistent with its beliefs were widely reported in the press.

81.     On August 19, 2021, an individual contacted New Hope purporting to inquire vaguely and generally about adoption. The next day, on Friday, August 20, New Hope director Kathy Jerman responded providing basic information, including an accurate description of New Hope's faith beliefs and the resulting boundaries of its services (as permitted and protected by the in-force preliminary injunction):

> Because of New Hope's convictions as a Christian adoption service, New Hope works with adoptive families built around a married husband and wife. Others may be eligible to adopt under New York law, and upon request New Hope can provide contact information about other adoption services in the area.

82.     Within minutes, this individual responded asserting that New Hope's practices violate New York law, and referring by name to New Hope's outside counsel.

83.     On Monday morning, August 23, this individual filed a lengthy, single-spaced complaint with the New York State Division of Human Rights ("the Complaint"). The Complaint accuses New Hope of violating New York law, and repeatedly references 18 NYCRR §421.3(d)—precisely the regulation that is currently the subject of the pending federal litigation, the prior decisions of the Northern District of New York and the Second Circuit Court of Appeals, and the

24

currently in-force preliminary injunction protecting New Hope against any enforcement of §421.3(d) to require it to change its policies. This Complaint attached more than 30 pages of exhibits.

84. This individual never requested or applied for any adoption services from New Hope, and New Hope did not reject an application from this individual.

85. On information and belief, this individual's August 19, 2021, query to New Hope was not made as part of a good faith effort to obtain adoption services. Rather, the inquiry was made with awareness of the widely publicized pending litigation and preliminary injunctions protecting New Hope's right to conduct its adoption ministry in a manner consistent with its faith, and for the sole purpose of harassing New Hope and enlisting the New York Division of Human Rights to assist in harassing and burdening New Hope, in utter disregard of the prior rulings and pending injunction.

86. Despite the pending litigation and in-force injunction, on August 23, 2021, the same day that the Complaint was filed with the NYDHR, the NYDHR sent a letter to New Hope enclosing the Complaint and purporting to demand that New Hope respond to all allegations within 15 days ("the NYDHR Letter"). On information and belief, NYDHR was also aware of the pending litigation and the in-force injunction protecting New Hope's rights under the First Amendment to continue its practice of placing infants only with families built around a married mother and father. Nevertheless, NYDHR is cooperating with the complaining

individual in this effort to burden and harass New Hope because of its religious beliefs.

87.    The NYDHR Letter generally referenced the New York State Human Rights Law (N.Y. Exec. Law, art. 15), but did not provide any specificity as to what portions of this lengthy statute NYDHR contemplates accusing New Hope of violating. However, in addition to 18 NYCRR §421.3(d), the Complaint asserts that New Hope "is a place of public accommodation," apparently seeking to invoke N.Y. Exec. Law §296(2)(a) ("the Public Accommodation Provision"). The Complaint also quotes and complains about New Hope's explanation of its policies contained in an email to the complainant, apparently seeking to invoke Section 296(2)(a)'s prohibition on publications by a place of public accommodation of any statement indicating that the patronage of any protected group is not "acceptable" or "desired" ("the Publication Ban").

88.    The possibility of any violation even potentially subject to the jurisdiction of the NYDHR depends upon New Hope being a "public accommodation." New Hope is not a public accommodation. In 2021, the United States Supreme Court rejected the contention that a similarly situated faith-based adoption agency is a "public accommodation," *Fulton*, 141 S. Ct. at 1881, while in 2020, the Second Circuit Court of Appeals preemptively disparaged as "surprising" and strained any contention that New Hope might be a "public accommodation" under New York law. *New Hope*, 966 F.3d at 166. On information and belief, all Defendants were aware of these governing precedents at the time the NYDHR

26

Letter was sent. As a result of these rulings, the decision of NYDHR to send the NYDHR Letter, and to purport to require New Hope to respond to the Complaint, could not be founded on a good faith reliance on governing legal authority, but instead disregarded the clearly established constitutional rights of New Hope. Unfortunately, NYDHR has chosen to join in and assist a legally baseless campaign of harassment against New Hope.

89.    Further, N.Y. Exec. Law §296 purports to prohibit discrimination in the provision of public accommodation based on "race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status." As reviewed above, however, New York law and regulations governing adoption specifically authorize–and in some cases require–adoption agencies, applicant parents, birthparents, and the State itself to "discriminate" in the recruiting and approval of adoptive parents, and in the placement of specific children with specific adoptive parents, based on factors including creed, color, sex, age, and disability.

90.    On information and belief, NYDHR has never before suggested that an adoption agency would violate N.Y. Exec. Law §296 as a result of any "discrimination" in the selection of adoptive parents based on criteria otherwise authorized by law. Accordingly, the choice by NYDHR to subject New Hope to an investigation based on its faith-based choice of the couples it will work with–a choice which a federal court has already preliminarily found is protected by the

27

United States Constitution–itself represents targeting and discrimination based on NYDHR's disapproval of New Hope's religious beliefs.

91. Further, N.Y. Exec. Law §296 contains an express religious exemption, specifying that "[n]othing contained in this section shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from . . . taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained" ("the Religious Exemption") (§296(11)). Yet, despite authoritative judicial findings that New Hope is indeed a religious organization, and that working to place infants for adoption with unmarried or same-sex couples would violate New Hope's religious principles, NYDHR has purported to require New Hope to respond to allegations that it has violated §296. For NYDHR to impose this threat and burden on New Hope in utter disregard of the religious exemption on the very face of the statute is again legally baseless, and further evinces animus and hostility against New Hope's religious beliefs.

**An investigation by any or all of the Defendants will inflict irreparable injury on New Hope.**

92. Being found in violation of any provision of the New York Human Rights Law could subject New Hope and officers and employees of New Hope of fines of up to $100,000 (§297), and criminal penalties including imprisonment (§299).

28

93. In light of the NYDHR Letter, New Hope faces a credible threat of an enforcement action by NYDHR, by the Attorney General, and/or by the Onondaga County District Attorney.

94. Application of the New York Human Rights Law or any other provision of New York law to require New Hope to operate in a manner that violates its religious beliefs, to affirm messages that it believes to be false, or to refrain from speaking messages that it believes to be true, would violate New Hope's Free Speech and Free Exercise rights, for the very same reasons for which the Federal District Court has already enjoined New York's OCFS agency from enforcing its regulations against New Hope to require New Hope to change its practice and violate its beliefs in this regard.

95. Even before a finding of violation and the imposition of penalties, an investigation by NYDHR of New Hope based on New Hope's constitutionally protected beliefs and practices, coupled with the threat of penalties contained in the NYDHR Letter, threatens immediate and irreparable injury to New Hope.

96. That threat puts New Hope to the immediate choice of self-censorship, violating its religious beliefs, temporarily ceasing operations, or risking escalating fines and other penalties. But New Hope cannot violate its religious convictions.

97. Among other things, NYDHR accuses New Hope of violating the law through its factual disclosure, in response to inquiry, of its choice to work only with families built around a married mother and father—a policy currently recognized as constitutionally protected by a preliminary injunction entered by a federal court. By

29

identifying this disclosure as a potential violation of New York law, NYDHR seeks to coerce New Hope to self-censor and *not* disclose its policy to inquirers, and thus to deprive New Hope of the benefit and protection of the currently in-force injunction.

98.    In addition, to avoid the alleged violations suggested by NYDHR's demand letter and the risk of escalating penalties, New Hope would not only have to change its policy but would have to refrain from speaking what it believes to be true about marriage, family, and the best interests of children, and to affirm by word and deed things it believes to be false, as detailed above.

99.    Further, even the pendency of an investigation by NYDHR will impose irreparable injury on New Hope. The investigation process itself is adversarial, with the NYDHR investigating on behalf of the complaining party. *See* N.Y. Exec. Law, App. §§465.4(a), (c), 465.6(a). It is highly intrusive, with the Attorney General or the Division empowered to take proof, make "field visit[s]," subpoena witnesses, administer oaths, compel responses to "written or oral inquir[ies]," compel the production of documents, and seek injunctions, or perform "any other method or combination thereof deemed suitable" for the investigation. N.Y. Exec. Law § 297.1, 297.3(a); N.Y. Exec. Law, App. §§465.6(b), 465.9(a). In light of New Hope's small size and limited resources, the burden and disruption on New Hope of being subjected to such an investigation would be severe.

100.    Further, as New Hope knows from experience, the pendency of a governmental investigation and allegations of violations of law quickly damage New Hope's reputation that was built up over many decades of faithful service, and

discourages hospitals, pregnancy resource centers, and social service agencies from referring birthmothers to New Hope to receive adoption services. This in turn damages New Hope's ability to serve and communicate to both adoptive parents and birth parents. For New Hope to rebuild its reputation after a formal investigation by the Attorney General or the NYDHR, and to regain the confidence of those who refer birthmothers to New Hope, or of adoptive parents who might wish to work with New Hope, would certainly take many months, and could well take years, depriving New Hope of specific opportunities to carry out its mission, and to serve infants, birthmothers, and families, that can never be recaptured.

101.　On the other hand, on information and belief, if New Hope were to choose to violate its beliefs and change its policy (which, in fact, New Hope cannot do), this also would greatly harm New Hope's reputation and it would lose some of its clients, including birthmothers, adoptive families, and foster families who choose to work with New Hope because of their shared Christian faith and faith-based values about marriage and family.

102.　New Hope has no adequate or speedy remedy at law for the loss of its constitutional rights.

103.　Unless Defendants' conduct is enjoined, New Hope will continue to suffer irreparable injury.

31

## Count I: Denial of Free Speech Rights Protected by the First and Fourteenth Amendment

104. New Hope repeats and re-alleges each allegation contained in paragraphs 1–103 of this Complaint as if fully set forth here.

105. New Hope holds and conveys a system of values about marriage, family, and the best interests of children to both birthparents and adoptive parents through its comprehensive evaluation, training, counseling, and placement programs.

106. The First Amendment prevents the government from compelling people to express, support, or promote a message not of their own choosing.

107. The First Amendment protects the right of persons to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

108. The First Amendment bars the government from compelling persons to expressively associate with others in the process of creating and disseminating speech.

109. The First Amendment protects New Hope's right to speak, to freely associate, to be free not to speak, and to not associate.

110. By investigating and threatening penalties against New Hope based on New Hope's choice to work only with married couples comprising a mother and a father, to recommend to birthmothers only married couples comprising a mother and father, and to affirm to the State its belief and conclusion that adoption by

32

married couples comprising a mother and father is in the best interests of each child committed to its care, NYDHS is chilling and violating New Hope's protected right of Free Speech.

111. In addition, by investigating and threatening penalties against New Hope based on its truthful disclosure, in an email sent to an inquirer, of New Hope's status as a Christian ministry and its beliefs and its policy of working only with married couples comprising a mother and a father, as protected by an in-force preliminary injunction entered by the United States District Court for the Northern District of New York, NYDHS is chilling and violating New Hope's protected right of Free Speech.

112. Including unmarried or same-sex couples in New Hope's comprehensive evaluation, training, counseling and placement programs and adoptive-parent profiles would inevitably alter the messages concerning marriage, family, and the best interests of children that New Hope desires to convey to adoptive families and birthparents, in violation of New Hope's protected right of Free Speech.

113. To require New Hope to approve unmarried or same-sex couples for adoption, or to approve specific adoptions by unmarried or same-sex couples, would require New Hope to represent to the State conclusions about the best interest of the child that New Hope believes to be false and would preclude New Hope from representing to the State the conclusions about the best interests of the child that it believes to be true, in violation of New Hope's protected right of Free Speech.

**Count II: Denial of Free Exercise of Religion Protected by the First and Fourteenth Amendment**

114.   New Hope repeats and re-alleges each allegation contained in paragraphs 1–103 of this Complaint as if fully set forth here.

115.   New Hope is a religious ministry that can and does exercise its religion in the course of its provision of information, instruction, counseling, and services, and in the way in which it chooses to speak and not speak during its activities.

116.   The First Amendment to the United States Constitution protects New Hope's rights to speak about, publish, and freely exercise its religious beliefs.

117.   The First Amendment prevents the government from interfering with New Hope's faith and mission.

118.   The First Amendment protects New Hope from government hostility, targeting, and discrimination because of its religious beliefs and practices.

119.   As federal courts have already recognized in granting a preliminary injunction, and as the Supreme Court's recent holding in *Fulton* strongly confirms, to put New Hope to the choice of violating its beliefs by placing children with unmarried or same-sex couples, and working with such couples to enable them to adopt, or alternatively to be at risk of severe penalties or being prevented from conducting its ministry, would violate New Hope's protected Free Exercise rights.

120.   By investigating or threatening to investigate New Hope under threat of penalty, based on allegations that New Hope's beliefs and practices in this regard violate New York law, NYDHS is violating and burdening New Hope's protected Free Exercise rights.

34

121. The New York Human Rights Law is not a law of "general applicability." *See Fulton*, 141 S. Ct. at 1877-78.

122. The definition of "public accommodation" in N.Y. Exec. Law. §292(9) contains numerous exceptions, carving out schools, kindergartens, and extension courses. Yet like schools, New Hope provides value-laden educational services, and New Hope's process of selecting those adoptive parents with whom it chooses to associate are far more intimate and exhaustive than the selection processes of at least most schools. The definition of "public accommodation" also excludes "distinctively private" clubs of less than 100 members, yet New Hope associates with considerably fewer than 100 adoptive parent candidates in a given year, and those interactions are intensely private.

123. In addition, N.Y. Exec. Law §296 expressly authorizes the Division of Human Rights to "grant[ ] exemption[s] based on bona fide considerations of public policy." §296(2)(b).

124. Further, with respect to the application of the New York Human Rights Law in the context of adoption, state statutes and regulations expressly confer extensive discretion on adoption agencies and allow adoption agencies to consider protected characteristics when making placements consistent with the best interests of the child, and allows parents to consider such characteristics for any reason. Thus, in the context of adoption, New York law authorizes multiple exceptions to any categorical non-discrimination rule, and it involves a system of individualized assessments.

35

125.    By threatening enforcement of §421.3(d) and N.Y. Exec. Law §296 against New Hope based on New Hope's faith-based beliefs and practice, while ignoring the many exceptions to the New York State Human Rights Law and its supposed non-discrimination rule provided by New York law and regulations, NYDHS is targeting and discriminating against New Hope based on its religious beliefs without justification, and demonstrating hostility toward New Hope's religious beliefs about marriage, family, and the best family environment for children, all in violation of New Hope's Free Exercise rights.

126.    As a result of this violation by NYDHS of New Hope's Free Exercise rights, New Hope is suffering and will continue to suffer irreparable injury.

127.    These violations of New Hope's Free Exercise rights are exacerbated by the fact that the violations censor and impair religiously motivated speech, triggering special scrutiny under the hybrid rights doctrine.

36

**PRAYER FOR RELIEF**

New Hope respectfully requests that this Court enter judgment against Defendants and provide New Hope with the following relief:

1.     Preliminary and permanent injunctive relief to stop Defendants, any persons acting in concert with Defendants, or any official of the State of New York, from enforcing N.Y. Exec. Law §296, including the Public Accommodation Provision therein, or N.Y. Civ. Rights Law §40, or any similar law or regulation, to impose or threaten any penalty on New Hope in connection with its constitutionally protected practice of working with and placing children with only married couples comprising a mother and a father;

2.     Preliminary and permanent injunctive relief to stop Defendants, any persons acting in concert with Defendants, or any official of the State of New York, from enforcing N.Y. Exec. Law §296, including the Publication Ban therein, or N.Y. Civ. Rights Law §40, or any similar law or regulation, to impose or threaten any penalty on New Hope for publicly explaining, in any context and through any medium, its religious beliefs concerning marriage, family, and the best interests of children, or from publicly explaining its constitutionally protected practice of working with and placing children with only married couples comprising a mother and a father;

3.     A declaration that the Public Accommodation Provision and the Publication Ban, as applied to Plaintiff's beliefs, practices, and messages described herein, or to New Hope's public explanation of its beliefs, policies, and practices,

37

violate Plaintiff's First Amendment rights under the United States Constitution to enjoy freedom of speech and press, freedom of association, and free exercise of religion;

4. Entry of an order adjudging, decreeing, and declaring the rights and other legal relations of the parties to the subject matter in controversy here so that these declarations shall have the force and effect of a final judgment;

5. That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6. That this Court award New Hope costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. §1988;

7. That this Court issue the requested injunctive relief without a condition of bond or other security being required of New Hope; and

8. That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 17th day of September, 2021.

*s/ Jonathan A. Scruggs*

Roger Brooks, NY Bar No. 2260537*
rbrooks@adflegal.org
Mark Lippelmann, AZ Bar No. 036553*
mlippelmann@adflegal.org
Jonathan A. Scruggs, N.D.N.Y Bar Roll No. 515373
jscruggs@ADFlegal.org
Jeremiah Galus, AZ. Bar No. 030469*
jgalus@ADFlegal.org
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
**Pro Hac Vice* application forthcoming

David Cortman, N.D.N.Y. Bar Roll No. 502661
dcortman@ADFlegal.org
Alliance Defending Freedom
1000 Hurricane Shoals Rd, N.E. Suite D-1100
Lawrenceville, GA  30043
(770) 339-0774
(770) 339-6744 (Fax)

*Attorneys for Plaintiff*

39

## VERIFICATION OF COMPLAINT

I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing factual allegations are true and correct to the best of my knowledge.

Executed this 16 day of September, 2021, at Syracuse , New York.

Kathleen L. Jerman
Executive Director

40